IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

WAYLAND GIBSON,

    Defendant.

                                             /

No. CR 11-00734 WHA

**ORDER RESOLVING MOTIONS TO SUPPRESS**

## INTRODUCTION

Defendant moves, via four separately filed and fully briefed motions, to suppress evidence obtained from the warrantless search of the lower unit of the residence at 1679 Oakdale Avenue on June 26, 2010, evidence obtained from the warrantless arrest of defendant on May 20, 2011, and evidence obtained from the warrantless collection of defendant's DNA on October 18, 2011. An evidentiary hearing was held and supplemental briefing was submitted after the hearing. For the reasons stated below, the motions to suppress are **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

The Court makes the following factual findings based on its review of all submission made on the four motions to suppress resolved herein and based on consideration of the testimony offered at the evidentiary hearing held on March 27, 2012, wherein Sergeant Daniel Manning, Inspector Silver (having the rank of officer at the time of search), and Ruby Brown, defendant's mother testified. At the pretrial conference on April 2, 2012, defense counsel consented to adding Exhibits A and B to the supplemental declaration of Randy S. Luskey in support of United States'

oppositions to defendant's motions filed on January 31, 2012 (filed under seal), to the evidentiary record. This order follows full briefing.

On October 4, 2011, defendant Wayland Gibson was indicted by a grand jury as a felon in possession of a firearm in violation of 18 U.S.C. 922(g)(1). The motions to suppress seek to suppress evidence obtained on three separate occasions. The evidence relates to the charges in the above-stated indictment.

### 1. SEARCH OF RESIDENCE ON JUNE 26, 2010.

The first-filed motion to suppress seeks to suppress the evidence that formed the basis of the felon-in-possession charge, namely, the 9-millimeter Glock and extended magazine seized during a warrantless search of the residence on June 26, 2010.

On June 26, Sergeant Daniel Manning and then Officer Daniel Silver of the San Francisco Police Department were working in plainclothes at the Bayview Station. The officers testified that they received information from a confidential source indicating that Kenneth Brown and his brother "Buck" were in possession of firearms in the lower unit of their shared residence at 1679 Oakdale Avenue in San Francisco. This order makes no finding as to the existence of a confidential informant or the truth of the officers' statements regarding the informant. Sergeant Manning knew "Buck" was an alias for Wayland Gibson, our defendant here. Sergeant Manning believed Mr. Brown and defendant lived in the lower unit of the residence of 1679 Oakdale Avenue in Bayview. He had observed defendant and his brother, Mr. Brown, hanging out in front of and around the front door of the lower unit of this residence on various occasions.

Sergeant Manning was familiar with defendant based on at least twenty prior law enforcement contacts with him. Officer Silver had not previously met defendant. Prior to the search of the residence, Sergeant Manning and Officer Silver both knew that defendant was a convicted felon.

Officer Ed Ochoa, also present at the Bayview Station on June 26, was a part of the team that conducted the search of the residence at issue. At 4:31 p.m. on June 26, prior to the search of the residence, he conducted a records search of Mr. Brown and determined that Mr. Brown was on active probation and subject to a warrantless search condition until October 1, 2010, as part of

the terms of his probation. At 4:32 p.m., Officer Ochoa conducted a DMV records check for Mr. Brown, which listed 1679 Oakdale Avenue as his mailing address. At 4:42 p.m., a records check was conducted for defendant. That check showed that defendant had an outstanding warrant for his arrest and listed 1679 Oakdale Avenue as his address. Officer Silver and Sergeant Manning were aware of the information obtained from the record checks, which were conducted prior to the search of the residence. And they understood the warrantless search condition of Mr. Brown's probation to mean that probable cause was not needed to search his residence.

At approximately 4:55 p.m. on June 26, a team of plainclothes SFPD officers, including Officers Alcaraz, Ellis, Ochoa, and Johnson, and Sergeant Manning and Officer Silver from the S.F. Gang Task Unit, responded to the lower unit of 1679 Oakdale Avenue to conduct a probation search of the residence. Sergeant Manning and the other officers conducted the search of the lower unit. Defendant's mother, Ruby Brown, was present in the lower unit when the officers arrived. What was said during the officers' conversation with Ms. Brown upon arrival is in dispute. The substance of the conversation, however, is not material to resolution of the motions at issue.

During the search of the lower unit, the investigating officers found two notices of delinquency sent from the Office of the Treasury and Tax Collector to defendant at the 1679 Oakdale Avenue address on May 20, 2010 and May 26, 2010, and an envelope dated April 23, 2010, addressed to the same address from the carpenter's union. They also found two notices to appear, at least one of which was signed by defendant in April 2010, and a certificate of release, indicating defendant's release from state custody on April 25, 2010. They found a jewelry receipt signed by "Ken B" and letter from a collection agency sent to Kenneth Brown.

As the search continued, Officer Silver noticed a bag containing men's laundry and removed the contents of the bag onto the couch. Upon removing the contents from the laundry bag, he found a 9-millimeter Glock and an extended gun magazine inside the pile of men's laundry. The firearm contained a loaded 17-round magazine. The extended gun magazine was a 30-round magazine and was also loaded. Officer Silver took photographs of the firearm and the

extended magazine and seized the items using a pair of latex gloves. Neither Mr. Brown nor defendant were home at the time of the search.

### 2. ARREST OF DEFENDANT ON MAY 20, 2011.

The second and fourth-filed motions relate to evidence obtained after defendant's arrest on May 20, 2011.

In the months following the search on June 26, 2010, numerous unsuccessful attempts were made to locate defendant. On May 20, 2011, at approximately 9:30 a.m., Sergeants Manning and Chorley saw defendant in the lobby of the Hall of Justice and notified Officer Silver. The two sergeants and Officer Silver then arrested defendant at the Hall of Justice. They conducted a search of defendant at the time of the arrest and seized two cell phones and a wallet from his person.

Defendant was taken to an interview room at the SFPD Gang Task Force offices, connected to the Hall of Justice. The officers conducted a "Mirandized audio-recorded interview" of defendant. The interview began with Officer Silver Mirandizing defendant. Defendant interjected and stated, "I don't want to hear none of that [expletive]." Sergeant Manning responded, "What's up with the faggot [expletive]?" Defendant stated, "Arrest me man and take me downstairs." About a minute and forty-five seconds later, defendant stated again, "Don't ask me no [expletive] questions." "Take me downstairs and arrest me." The officers continued to ask him questions for about fifteen minutes.

On May 20, 2011, Officer Silver obtained a search warrant for a court-ordered sampling of defendant's DNA. Oral swabs were taken from defendant and booked into evidence.

Approximately one to two hours after defendant was arrested and less than 100 yards from the site of the arrest, Officer Silver searched the two cell phones seized from defendant when he was arrested. Officer Silver, conducted a forensic download of the contents of the cell phones and retained digital information on a CD in defendant's case file.

### 3. ARREST OF DEFENDANT ON OCTOBER 18, 2011, AND SUBSEQUENT DNA COLLECTION.

The third-filed motion to suppress seeks to suppress DNA evidence obtained from defendant after his arrest on October 18, 2011.

4

Defendant was indicted by a grand jury on October 4. On October 18, he was arrested by SFPD officers pursuant to an arrest warrant issued in connection with the indictment in this action. Defendant was transferred into federal custody on October 19. Upon his booking into federal custody, and without a warrant, Special Agent Jacob Millspaugh collected a DNA sample from defendant.

**ANALYSIS**

**1. WARRANTLESS SEARCH OF RESIDENCE.**

The first-filed motion to suppress raises three main arguments in support of suppression. *First*, that the probation search of the residence was unreasonable because the officers failed to obtain and review the terms of Mr. Brown's probation prior to conducting a search of the residence. *Second*, that the probation search was a pretext to search for evidence against defendant. *Third*, that the officers lacked probable cause to seize the gun and magazine discovered during the search because they had no prior knowledge that defendant was a convicted felon at the time of the search.

Based on the foregoing findings of fact, the order concludes that the warrantless probation search conducted of the lower unit of the residence at 1679 Oakdale Avenue, was lawful. Thus, the evidence obtained as a result of the search need not be suppressed.

**A. Probation Search Was Lawful.**

As a term of his probation, Mr. Brown was subject to a warrantless search condition, which stated: "[Mr. Brown] is subject to a warrantless search condition, as to [his] person, property, premise and vehicle, any time of the day or night, with or without probable cause" (Luskey Exh. C).

Prior to conducting a warrantless probation search, an officer must have probable cause to believe the probationer lives in the residence to be searched. *See United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006) ("[T]he facts known to the officers at the time of the search must have been sufficient to support a belief, in a [person] of reasonable caution," that the probationer lived at the residence searched"); *United States v. Franklin*, 603 F.3d 652, 656 (9th Cir. 2010) ("Before conducting a warrantless search pursuant to a [] parole condition, law enforcement

officers must have probable cause to believe that the parolee is a resident of the house to be searched.").

The facts known to the officers at the time of the search were sufficient to support a reasonable belief that Mr. Brown lived at the residence searched. Prior to the search, the officers obtained and reviewed Mr. Brown's DMV records. The DMV records showed that as of June 8, 2010, Mr. Brown's reported address of record was 1679 Oakdale Avenue. (Supp. Luskey Decl. ¶ 9; Supp. Luskey Exh. A at 18). The officers also knew that Mr. Brown's criminal history report listed 1679 Oakdale Avenue as his address of record (Supp. Luskey Exh. A at 21). Additionally, Sergeant Manning had observed Mr. Brown hanging out in front of the lower unit of the residence searched on various occasions (Manning Decl. ¶¶ 3–5; Reporter's Transcript 22–23).

In *Howard*, our court of appeals reviewed numerous cases where the court upheld the search of an address *not reported* by a parolee or probationer and identified factual patterns emerging from each of those decisions that formed the basis for probable cause. Whereas here, Mr. Brown had reported 1679 Oakdale Avenue as his address, this strongly and sufficiently supports a finding that the officers had probable cause to believe it was, in fact, his residence.

The only remaining question is whether the officers reasonably could have determined that the lower unit was part of 1679 Oakdale Avenue, the address reported by Mr. Brown. A photo taken of the residence on the day of the search shows a three-level residence. At street level, there is a street-level entrance to a unit — referred to herein as the lower unit — with no numbers indicating a separate address. The left side of the lower unit is flanked by a stair case leading up to another front door. This door is to the "upstairs" unit, which Ms. Ruby Brown testified was 1679 Oakdale Avenue (RT 195). By contrast, she testified that the lower unit was 1681 Oakdale Avenue and that at some point her husband had "changed" the numbers on both the lower and upstairs units (RT 194–96). On the day of the search, the lower unit did not bear a separate address from the address of the "upstairs" unit. To the left of the staircase is a garage. The lower unit, upstairs unit, and garage all appeared to be connected (and in fact were). On the day of the search, prior to conducting the search, there was nothing to indicate to the officers that the lower unit had a separate address from the "upstairs" unit. Based on the totality of

circumstances, the officer had probable cause to believe Mr. Brown lived at 1679 Oakdale Avenue, an address he had reported. And prior to the search, the officers did not have any reason to believe that the residence searched was not 1679 Oakdale Avenue. Although this order need not rely on information allegedly received from a confidential informant to find the officers had probable to believe Mr. Brown resided in the lower unit of 1679 Oakdale Avenue, the order notes that this is what the officers have testified the alleged confidential informant told them.

The Fourth Amendment prohibits unreasonable searches. Generally, a search conducted without a warrant issued upon a showing of probable cause is *per se* unreasonable, subject to certain exceptions. *See Katz v. United States*, 389 U.S. 347, 356–57 (1967). A probation search is one such exception.

In *United States v. Knight,* 534 U.S. 112, 119 (2001), the Supreme Court held that the Fourth Amendment "requires no more than reasonable suspicion to conduct a search of [a] probationer's house," leaving open the question whether reasonable suspicion was necessary. *Id*. at 120 n.6, 121. In *Samson v. California*, the Supreme Court held that the Fourth Amendment permits the search of a parolee's residence without any particularized suspicion. 547 U.S. 843, 850–56 (2006). In so doing, the Supreme Court relied on its reasoning in *Knight*, emphasizing that parolees, like probationers are more likely than ordinary citizens to violate the law and "conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal" because they are aware that they are subject to supervision and revocation of their status. *Id*. at 849. The Court also considered the state's interest in reducing recidivism and found it to be overwhelming, concluding that suspicionless searches provide the state an effective tool to that end. *Id.* at 853. Recently, relying on *Samson*, our court of appeals held unequivocally that a "suspicionless search of a probationer does not violate the Fourth Amendment." *United States v. Baker*, 658 F.3d 1050, 1055 (9th Cir. 2011) (applying the rule that "there is no constitutional difference between probation and parole for purposes of Fourth Amendment").

Mr. Brown had a warrantless search conditions which stated: "[Mr. Brown] is subject to a warrantless search condition, as to [his] person, property, premise and vehicle, any time of the day or night, with or without probable cause" (Luskey Exh. C). In *United States v. King*, another

7

recent decision by our court of appeals, the court held that officers do not need reasonable suspicion to conduct a probation search for a person who is subject to a warrantless search as a condition of his probation. 2012 U.S. App. LEXIS 5262, at *14 (9th Cir. March 13, 2012). In *King*, the defendant, like Mr. Brown, was subject to a warrantless search as a condition of probation, with the following terms: "Defendant is subject to a warrantless search condition, as to defendant's person, property, premises and vehicle, any time of the day or night, with or without probable cause." *Id*. at *5. The court reasoned,

> [s]imply because a search may be conducted without probable cause does not mean that it must be conducted with reasonable suspicion. It would be unreasonable to read defendant's probation condition as implicitly imposing a reasonable suspicion requirement. To the contrary, the plain import of defendant's probation condition, allowing warrantless searches at any time, is that defendant may be searched whether or not police suspect him of wrongdoing.

*Id*. at *14.

Thus, the officers did not need reasonable suspicion to conduct the probation search. Defendant contends that even if the officers knew Mr. Brown had a "search condition," they did not know the "terms" of those conditions. But the evidence shows that the officers knew the search condition was a warrantless condition and understood from this that they did not need a warrant or probable cause to conduct the search of the residence.

Additionally, defense counsel contends that a tip from a confidential source cannot support reasonable suspicion to believe Mr. Brown was engaged in criminal activity on June 26, because the confidential informant's " vague and incomplete statement is insufficient to establish reasonable suspicion " (Reply Br. 7). The officers, however, did not need to rely on the confidential informant's information, if indeed there was a confidential informant, in order to establish reasonable suspicion for the search. *See King*, 2012 U.S. App. LEXIS 5262, at *14.

Finally, defense counsel challenges the officers' motivations for conducting the probation search, arguing that the officers used the probation search as a pretext to search for evidence against defendant. The Supreme Court made clear in a case involving probation searches that "[w]ith the limited exception of some special needs and administrative cases" it "ha[s] been unwilling to entertain Fourth Amendment challenges based on the actual motivations of

8

individual officers." *Knights*, 534 U.S. at 122. Even so, the records reflect that a records check for Mr. Brown was conducted before a records check for defendant (Supp. Luskey Exh. A).

Based on the foregoing, the order concludes that the search of the lower unit of the residence at 1679 Oakdale Avenue, was a lawful probation search. The next question, is whether there was probable cause to seize the gun and magazine that was discovered as a result of the search.

### B. Probable Cause to Seize Firearm.

Defense counsel contends that the officers lacked probable cause to believe that the gun and magazine, "which may be lawfully possessed by millions of persons, constituted evidence of a crime" (Br. 6). Not so. Sergeant Manning, who knew defendant based on at least twenty prior law enforcement contacts over the last nineteen years, knew that defendant was a convicted felon, who had recently spent time in federal prison (Manning Decl. ¶ 4). Officer Silver was also aware that defendant was a convicted felon (Silver Decl. ¶ 4). The officers knew, based on their records search, that 1679 Oakdale Avenue was defendant's address of record and based on Sergeant Manning's previous observations of him hanging around outside the lower unit and the various mail items found in the lower unit addressed to defendant, had probable cause to believe he lived in the lower unit. Thus, there was probable cause to believe that defendant was a convicted felon and that possession of a gun would have constituted evidence of a crime.

### C. Suppression is Not Warranted.

Evidence seized as the result of an illegal search or seizure is the "fruit of the poisonous tree" and should be excluded. *Wong Sun v. United States*, 371 U.S. 471, 484–85, 488 (1963). Because the probation search and seizure of the gun and magazine were lawful, suppression is not warranted here.

### 2. WARRANTLESS ARREST ON MAY 20, 2011.

#### A. Arrest.

A warrantless arrest is permissible under the Fourth Amendment when officers have probable cause, at the moment the arrest was made, to make it, meaning that at the moment of arrest, "the facts and circumstances within their knowledge and of which they had reasonably

trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91 (1964). This determination is a "practical, nontechnical conception," based on "common-sense and conclusions about human behavior." *Illinois v. Gates*, 462 U.S. 213, 231 (1983). "In applying these standards, [courts] must consider all the facts known to the officers and consider all the reasonable inferences that could be drawn by them before the arrest." *United States v. Bernard*, 623 F.2d 551, 559 (9th Cir. 1980). It is settled in our court of appeals, that officers may draw on their own experiences and specialized training "to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Hart v. Parks,* 450 F.3d 1059, 1067 (9th Cir. 2006).

Here, the evidence supports a finding that the officers had probable cause to arrest defendant on May 20, 2011 based on their belief that he was a felon in possession of a gun and ammunition, in violation of California Penal Code Section 12021. Sergeant Manning and Officer Silver, both arresting officers on May 20, were also present during the search of defendant's residence on June 26, 2010, wherein Officer Silver discovered a gun.

At the time of defendant's arrest, Sergeant Manning and Officer Silver knew that a loaded 9-millimeter Glock and extended magazine had been located in a residence known to be the place of residence for defendant and his brother, Mr. Brown. They knew prior to the search of the residence that defendant and his brother listed that residence as their address (Silver Decl. ¶¶ 4, 6). During the search, various mailings and documents further supported the fact that the lower unit of the residence at 1679 Oakdale Avenue, which they were searching, was, indeed, where defendant and his brother resided (Silver Decl. ¶ 7; Balogh Exh. F). At the time of the arrest, they also knew that defendant was a convicted felon (Manning Decl. ¶ 4, 7; Silver Decl. ¶ 4). They also knew that Mr. Brown, defendant's brother had prior misdemeanor conviction for possession of marijuana and no qualifying felony convictions (Silver Decl. ¶ 11).

The fact that Mr. Brown was also known to live at the same residence as defendant, did not undermine the relevance of the above-stated facts, because the law is clear that two

1 individuals can possess the same gun. *See People v. Sifuentes*, 195 Cal. App. 4th 1410, 1417
2 (2011); *United States v. Carrasco*, 257 F.3d 1045, 1050 (9th Cir. 2001).

3 Defense counsel argues that there was not probable cause to support the officers' belief
4 that defendant possessed the gun and magazine because he was not found to be in physical
5 possession or in temporal proximity to the gun. To show constructive possession, the government
6 must show "a sufficient connection between the defendant and the contraband to support the
7 inference that the defendant exercised dominion and control" of the gun and magazine. *Carrasco*,
8 257 F.3d at 1049. The officers found the gun at defendant's residence, in a bag of men's laundry,
9 in proximity to various mailings and court documents indicating defendant resided in the
10 particular unit in which the gun and magazine were found. Taken together, these facts support a
11 finding of constructive possession. That his brother may have also had access to the gun and
12 magazine does not require a different conclusion. Nor in light of all of the above-stated facts,
13 does the fact that the officers were unaware of the last time defendant was at the premise.

14 Finally, defense counsel contends that the arrest was *per se* unreasonable because the day
15 prior to the arrest Officer Silver received information that the Bayview Plainclothes Unit would
16 not authorize a warrantless arrest of defendant. At that time, Officer Silver did not "report" to the
17 Bayview Plainclothes Unit (Silver Decl. ¶ 12). Moreover, this information did not lessen Officer
18 Silver's belief that there was probable cause to arrest defendant.

19 Based on the totality of these circumstances the officers had probable cause to arrest
20 defendant on May 20, 2011.

21 **B. Statements.**

22 Defense counsels moves to suppress all statements defendant made to the arresting
23 officers on May 20, 2011, following defendant's invocation of his *Miranda* rights. There is no
24 dispute that defendant was Mirandized at the outset of the officers' custodial interrogation of him.

25 Inculpatory statements made by a defendant during a custodial interrogation are only
26 admissible if the defendant made a voluntary, knowing, and intelligent waiver of his *Miranda*
27 rights. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). A waiver is knowing and intelligent if
28 "under the totality of the circumstances it was made with full awareness of both the nature of the

11

right being abandoned and the consequences of the decision to abandon it." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005), *amended*, 416 F.3d 939. There is a presumption against waiver and the government bears the burden of proving waiver by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Prior to obtaining an unambiguous and unequivocal waiver, the interrogating officer has a duty to clarify any ambiguous or equivocal statements of waiver. *United States v. Rodriguez*, 518 F.3d 1072, 1080 (9th Cir. 2008). Put another way, "interrogating officers [are] under a duty to clarify what [a defendant] means — and if he mean[s] he d[oesn't] want to talk, that right should [] be scrupulously honored." *Ibid*. Our court of appeals has stated that an arrestee's statement that "he wanted to be taken into custody was an indication that [he] did not want to talk." *Anderson v. Terhune*, 516 F.3d 781, 788 (9th Cir. 2008). Once *Miranda* is invoked, officers must desist from asking further questions. *United States v. Shi*, 525 F.3d 709, 729 (9th Cir. 2008).

The government claims that defendant impliedly waived his *Miranda* rights when he continued to answer the officers' questions after receiving *Miranda* warnings, and that after waiving his *Miranda* rights, he did not subsequently invoke his right to silence.

Here, the audio recording of the interview makes clear that, at minimum defendant did not unambiguously and equivocally waive his *Miranda* rights. Immediately after defendant was Mirandized, he stated, "I don't want to hear none of that [expletive] . . . Arrest me man and take me downstairs." The officers did not ask defendant if he understood his *Miranda* rights or seek to clarify what he meant by these statements. About one minute and forty-five seconds later, defendant stated again, "Don't ask me no [expletive] questions." "Take me downstairs and arrest me."

An implied waiver is not found here, where throughout the course of the interview, defendant continued to curse the officers, tell them to "do their job," and respond to most of their questions by insulting the officers, telling them he did not "care about" what they were telling him. The totality of the circumstances of the interview point toward the fact that defendant did not want to talk to the officers.

The government has not met its burden of proving waiver. Thus, all statements defendant made after he was Mirandized will be suppressed, as they were obtained in violation of defendant's *Miranda* rights.

### C. DNA Evidence and Wallet.

Defendant's arrest on May 20, 2011, was lawful, thus, there is no basis to suppress the DNA evidence or the wallet under the fruit of the poisonous tree doctrine. Moreover, a court-ordered search warrant was obtained, authorizing the seizure of oral DNA swabs from defendant. The DNA swabs were collected pursuant to the lawfully obtained warrant (Balogh Exh. B).

### D. Search and Seizure of Phone.

Defense counsel contends that the search of the two cell phone's found on defendant's person during the search following his arrest was not incident to arrest, and must be suppressed. The government defends the search and seizure of the cell phones on the ground that the cell phones were seized and searched incident to a lawful arrest. The order agrees that the arrest was lawful. But the search of the phones was not incident to arrest.

Officers may search an arrestee's person incident to a lawful arrest. *See United States v. Robinson*, 414 U.S. 218, 224 (1973). The justification for permitting a warrantless search is the need of law enforcement officers to seize weapons or other things which might be used to assault an officer or effect an escape, as well as preventing the loss or destruction of evidence. *United States v. Hudson*, 100 F.3d 1409, 1419 (9th Cir. 1996). "[A] search incident to arrest must be conducted at about the same time as the arrest." *Ibid*.

The Supreme Court recognized an exception to the contemporaneous requirement and authorized a warrantless search of a suspect's clothes, which occurred ten hours after the arrest at the police station house. *United States v. Edwards*, 415 U.S. 800, 805 (1974). In *Edwards*, the police took the arrestee's clothes to examine them for evidence of a crime, namely, that examination of the clothing would reveal paint chips matching the samples that had been taken from the window of the post office, which the defendant was charged with attempting to break into that night.

This is contrasted to *United States v. Chadwick*, where officers seized a footlocker at the time of an arrest and searched the locker approximately an hour later. 433 U.S. 1, 15 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1982). There, the results of the search were suppressed. The Supreme Court reasoned:

> [W]arrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the search is remote in time or place from the arrest, or no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer a search incident of the arrest.

The Supreme Court distinguished *Edwards*, stating, "[u]nlike searches of the person, searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest." *Chadwick*, 433 U.S. at 16 n.10.

Here, the officers did not search the phone at the time of the arrest. Instead, the officers searched it approximately one to two hours after arresting defendant. Individuals store highly personal information on their cell phones, including private thoughts, emails, photos, and voice messages. The subsequent search and data retrieval of information contained on the cell phones found on defendant's person appear to go far beyond the purpose underlying the rationales in support of warrantless searches incident to arrest. The record does not show exigent circumstances justifying the search of the phone, indeed, the phone was not searched until one or two hours after defendant's arrest. Moreover, Officer Silver indicated that the phones were seized "for later searches for evidence of [pimping]" (Balogh Exh. D at W-0013). There is no basis upon which to conclude that the subsequent search of the two cell phones was incident to arrest. The government offers no other reason in support of the search of the cell phones.

Accordingly, suppression of the contents of the two cell phones seized from the person of defendant on May 20, 2011, is ordered.

**3.  ARREST OF DEFENDANT ON OCTOBER 18, 2011 AND SUBSEQUENT DNA COLLECTION.**

Generally, a search conducted without a warrant issued upon a showing of probable cause is *per se* unreasonable, subject to well-delineated exceptions. *Katz v. United States*, 389 U.S.

14

347, 356–57 (1967). At issue here is a provision of the DNA Backlog Elimination Act of 2000, which was modified in 2006. The 2006 version of the statute authorizes collection of a DNA sample "from individuals who are arrested, facing charges, or convicted . . . ." 42 U.S.C. 14135a(a)(1)(A). Furthermore, the regulations state that: "Any agency of the United States that arrests or detains individuals or supervises individuals facing charges shall collect DNA samples from individuals who are arrested, facing charges, or convicted, and from non–United States persons who are detained under the authority of the United States." 28 C.F.R. 28.12(b).

Defense counsel challenges the constitutionality of the statute, arguing that the warrantless seizure of DNA from an arrestee violates the Fourth Amendment. The touchstone of Fourth Amendment analysis "is always the reasonableness in all circumstances of the particular governmental invasion of a citizen's personal security." *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (2006).

The defense relies on two decisions by our court of appeals, *United States v. Kincade,* 379 F.3d 813 (9th Cir. 2004) (en banc) and *United States v. Kriesel*, 508 F.3d 941 (9th Cir. 2007), wherein the court considered the constitutionality of two statutory provisions mandating DNA collection of individuals who have been convicted of certain federal crimes. In both decisions, the court relied on the fact that individuals who have been convicted of a crime are properly subject to less than the full rights of citizens. *Kincade*, 379 F.3d at 833.

In *Kincade*, our court of appeals upheld the requirement that individuals convicted of certain federal crimes provide DNA blood samples. In so doing, the plurality applied the totality of the circumstances test and concluded that the compelled DNA collection "can only be described as minimally invasive — both in terms of the bodily intrusion it occasions, and the information if lawfully produces." *Kincade*, 379 F.3d at 838. The court stated, "But beyond the fact that the DNA Act itself provides protections against such misuse, our job is limited to resolving the constitutionality of the program before us, as it is designed and as it has been implemented." *Id.* at 837–38. On the other side of the equation, the court considered the governmental interests at stake, including that the DNA collection would help ensure compliance with parole requirements, the deterrent effect would reduce recidivisim, and DNA collection

15

would provide a means of identification that could be used to assist law enforcement. The court concluded the governmental interest outweighed the defendant's privacy interest.

In *Kriesel*, the court upheld an amendment to the federal DNA collection act, which required DNA collection from all persons convicted of federal felonies. The court held that under the totality of the circumstances, the statute was constitutional "because the government's significant interest in identifying supervised releasees, preventing recidivism, and solving past crimes outweigh the diminished privacy interests that may be advanced by a convicted felon currently serving a term of supervised release." 508 F.3d at 950.

Defendant contends that because a pretrial arrestee "does not have the reduced privacy interests of the defendants then subject to felony convictions," the government cannot demonstrate an exception to the warrant requirement under the totality of the circumstances test (Br. 7). Recently, in a decision upholding the constitutionality of a California statute permitting warrantless collection of DNA from persons arrested for felonies, our court of appeals concluded that a felony arrestee has a diminished privacy interest. *Haskell v. Harris*, 669 F.3d 1049 (9th Cir. Feb. 23, 2012). The court recounted the following ways in which such an arrestee's privacy was diminished:[*]

> Upon arrest, individuals are often booked and placed in a jail cell pending arraignment or bail, and at that point they are typically subjected to numerous degrading physical and emotional intrusions. They may be subjected to visual body cavity searches, *Bell*, 441 U.S. at 558 & n.39, 99 S. Ct. 1861 (upholding searches where male inmates "must lift [their] genitals and bend over to spread [their] buttocks for visual inspection" and "[t]he vaginal and anal cavities of female inmates also are visually inspected"); *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 974–75 (9th Cir. 2010) (en banc) (same); be monitored by guards of the opposite sex while they shower and use the toilet; . . . [and] have their telephone access restricted, *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048–49 (9th Cir. 2002).

---

[*] Notably, in *Haskell*, the court distinguished its decision in *Friedman v. Boucher*, 580 F.3d 847 (9th Cir. 2009), wherein the court held that under the circumstances, mere status as a pretrial detainee did not justify the forcible collection of a DNA swab from defendant. In *Haskell*, the court explained that "[t]he search in *Friedman* raised far more significant Fourth Amendment concerns . . . because there was no statutory authorization for the search, authorities singled out one individual, and there were no restrictions on the access to, or use of, the DNA information." 669 F.3d at 1057.

16

Defendant was a felon arrestee who was indicted by a federal grand jury based on a finding that there existed probable cause to support a finding that he was a felon in possession of a firearm. Given defendant's diminished privacy interest as a felon arrestee, the minimal intrusive nature of taking the DNA swab, the statutory protections limiting the use of the DNA obtained, and the government's interest in obtaining DNA samples for law enforcement purposes, including, deterring future crimes, exonerating innocent suspects, and determining a person's true identity, the government's interest in obtaining a DNA sample in this instance substantially outweighs defendant's privacy interest.

Based on the precedent in our court of appeals, the order finds no basis upon which to conclude that the statutory provision at issue is unconstitutional or that the seizure of defendant's DNA, as authorized by the statute was in violation of defendant's Fourth Amendment rights. As such, there is no basis for suppression.

## CONCLUSION

For the above-stated reasons, the motion to suppress is **GRANTED IN PART AND DENIED IN PART**, to the extent stated above.

**IT IS SO ORDERED.**

Dated: April 3, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE